AO91 (Rev. 12/03) Criminal Complaint

# UNITED STATES DISTRICT COURT

**MIDDLE** DISTRICT OF **NORTH CAROLINA**

UNITED STATES OF AMERICA
V.
LAWRENCE SOLIN
2734 Avenue E, Sarasota, Florida

8:05-M-339 TGW
**CRIMINAL COMPLAINT**

Case Number: 1:05m 0 143-1

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about __07/2002 - 06/2005__ in __Guilford and Yadkin__ County, in
(Date)
the __Middle__ District of __North Carolina__ defendant(s) did,
*(Track Statutory Language of Offense)*
execute and attempt to execute a scheme to defraud through the use of commercial interstate carriers and interstate wire communications

in violation of Title __18__ United States Code, Section(s) __1341 and 1343__.
I further state that I am a(n) __Special Agent__ and that this complaint is based on the
Official Title
following facts:
See attached affidavit

Continued on the attached sheet and made a part of this complaint:   x  Yes   ☐ No

_____
Signature of Complainant

Special Agent David T. Gardner, FBI
Printed Name of Complainant

Sworn to before me and signed in my presence,

06/28/2005                                                    at    Winston-Salem, North Carolina
Date                                                                City and State

U.S. Magistrate Judge Russell A. Eliason            _____
Name and Title of Judge                                      Signature of Judge

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

### Introduction

1. David T. Gardner, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), Greensboro, North Carolina, having been duly sworn, hereby submits the following information in support of a criminal complaint and arrest warrant for Lawrence Solin.

2. Affiant submits there is probable cause to believe that from approximately the fall of 2002 until the present, Lawrence Solin of Sarasota, Florida, devised, executed, and attempted to execute a scheme to defraud large national publishing companies and foam bedding manufacturers through the use of material false statements and the concealment of material information. In schemes of this sort, which are commonly referred to as "bust out" schemes, perpetrators make material false statements and conceal material information to fraudulently obtain products or services which they convert into or use to obtain profits for themselves and then disappear without paying for the products or services. In this instance, Solin, using aliases and taking steps to avoid being identified, fraudulently obtained over $1,000,000 in magazine advertising geared towards the sale of a foam bedding product through numerous material false statements and by concealing material information. Solin then obtained his share of the profits that resulted from the sale of thousands of units of foam bedding product sold due to the advertisements. Solin, however, failed to pay for the advertising as he had agreed and disappeared only to reappear under a different company name and alias, whereupon he attempted to repeat the execution of the scheme on at least two other occasions. Solin committed numerous acts to execute the scheme, including using and causing the use of commercial interstate carriers and interstate wires (e.g., telephone calls, facsimiles, e-mails, and bank transfers), in violation of 18 U.S.C. §§ 1341 and 1343, mail and wire fraud.

3. Affiant has been employed as a Special Agent Accountant of the FBI for over five years and has received specialized training and experience in the investigation of financial crimes in violation of federal law. Affiant has conducted investigations which led to successful prosecutions for violations of mail fraud, wire fraud, bank fraud, securities fraud and money laundering, as well as other violations of federal law. Affiant has bachelor's and master's degrees in accounting and business administration and worked in those fields for five years before becoming an FBI agent.

### Overview

4. In June 2005, Keith, Dan and Mark Pavlansky of a Hibco Plastics, a foam company of Yadkin County, North Carolina, hereinafter referred to as Hibco, reported to the FBI that they believed they were in contact with an individual who was conducting what they believed to be a fraud scheme using the name of Martin Scott and doing business as Winfield Capital Partners (WCP). Scott mostly dealt with Mark Pavlansky, the President of Hibco, but all of the Pavlanskys are involved in the business together and have had contact with Scott. As explained below, Scott has been identified as Solin. The Pavlanskys explained that, in April 2005, Scott contacted a supplier of Hibco, North Carolina Foam Industries (NCFI), of Mount Airy, North Carolina, and

attempted to determine if they would be interested in a joint venture in order to manufacture and sell foam bed toppers, a several inch thick foam padding and cover which fits on top of a mattress to enhance the mattresses' comfort. Scott represented that he would be involved in the marketing of the product and that he and his group of investors would provide $1,000,000 in print media advertising if NCFI would manufacture and ship the product. NCFI and Scott were to split the profits from this joint venture. NCFI was not interested in the joint venture because it did not fit their business plan. Scott asked NCFI if they knew any other companies which would be interested in this type of joint venture and NCFI recommended that Scott contact Hibco and another company. Mark Pavlansky learned the information above from NCFI after the fact and Mark Pavlansky later relayed this information to Affiant.

5. Thereafter, in April 2005, Scott, doing business as WCP, contacted Hibco and reported that he and his partners wanted to enter into a joint venture with Hibco and that he would provide $1,000,000 to be used for marketing foam bed toppers to be manufactured by Hibco. Scott represented that he would place advertisements in large national women's magazines such as Redbook, Better Homes and Gardens, McCalls, and Country Living. Scott explained that a call center would be set up to accept calls from customers who wished to purchase the product after viewing the advertisements. Employees of the call center would be trained on sales methods for the products by Scott. Hibco would only be responsible for manufacturing the product and setting up a credit card processing terminal and bank accounts to receive funds from sales of the product. Thereafter, Hibco and Scott were to share in the profits from the joint venture. Scott also advised that he would provide telephone number 866-662-8700 to be utilized during the joint venture and Scott would pay for the toll free calls. A search of the Internet Website, www.anywho.com, identified the subscriber of the toll free number as Jordan Industries of Sarasota, Florida.

6. From April through June 23, 2005, Scott sent Hibco approximately six overnight express packages via commercial interstate carriers containing various items in reference to the joint venture to include computer disks, fabric samples and documents. On one occasion, Scott provided a design of a website printed on thick card stock paper.

7. Mark Pavlansky explained that the business plan presented by Scott seemed reasonable and Hibco was seriously considering entering into a joint venture with Scott. For several weeks, even to the present, Mark Pavlansky and Scott have maintained daily e-mail and telephone contact in an effort to enter into the joint venture and begin the sale of foam bed toppers. Mark Pavlansky explained that the person using the name of Scott knew the foam bedding industry very well and he was very thorough as conversations routinely lasted for several hours. During this time period, Buddy Swicegood, a foam salesmen whom the Pavlanskys have known for years contacted Hibco to make a sales call. Hibco explained to Swicegood that they were planning to enter the bed topper industry and Swicegood explained that he was knowledgeable of the industry. Swicegood, who was previously employed at Vita-Foam of High Point, North Carolina, explained that he had dealt with a project to sell bed toppers while he was at Vita-Foam. Swicegood asked Mark Pavlansky further questions about why Hibco was getting into the foam bed topper industry and Mark Pavlansky explained to Swicegood the propositions made by Scott. Swicegood immediately

advised Mark Pavlansky that the representations being made by Scott where identical to representations made a period of time before to Swicegood, and other employees of Vita-Foam, by an individual using the name of James Baldwin and doing business as United Capital Partners (UCP).

8. Swicegood explained that the person using the name of Baldwin made a proposition to Vita-Foam in which he and his investment partners would provide $1,000,000 to be used to place advertisements in national women's magazines if Vita-Foam would manufacture and ship the product. Baldwin proposed that call centers be set up to take calls from customers and that UCP would receive 50% of the profits from the joint venture. Vita-Foam agreed to Baldwin's proposal and advertisements appeared in large national women's magazines offering the product for sale. For a period of a few months, calls came into the call center and several thousand units were sold. Vita-Foam had set up bank accounts to handle the funds received from customers and profits of hundreds of dollars per unit were sent to Baldwin.

9. Swicegood explained to Mark Pavlansky that after a few months, the advertisements ceased to be in the magazines and sales of the products dropped off. Shortly thereafter, Baldwin contacted Vita-Foam and advised that he and his investors wished to pull out of the joint venture. Vita-Foam offered to buy-out Baldwin and Baldwin then sold his share of the joint venture to Vita-Foam. Shortly thereafter, Vita-Foam was no longer able to contact Baldwin and telephone numbers and e-mail accounts of Baldwin and UCP were no longer in service.

10. Swicegood further explained to Mark Pavlansky that after a short period of time, Vita-Foam was sued by several national publishing companies because Baldwin and UCP had never paid any of the expenses associated with placing the advertisements in the magazines as promised. It was further learned that Baldwin had told the publishing companies that Vita-Foam was responsible for paying the advertising costs.

11. Mark Pavlansky had saved several voice-mail messages left by the person using the name of Martin Scott. Mark Pavlansky attempted to play the several messages for Swicegood and after listening to just one or two, Swicegood told Mark Pavlansky that he did not need to listen to any more because he was sure that the person posing as Martin Scott on the voice-mail was the same person who had used the name of James Baldwin. Swicegood explained to Mark Pavlansky that he had talked with this individual numerous times for over two hours each time, just as Mark Pavlansky had described his conversations, and he was sure that it was the same person.

12. During the course of attempting to enter into the joint venture with Scott and WCP, Mark Pavlansky was involved in several conference calls with Scott and various call centers which Mark Pavlansky located. Mark Pavlansky explained that during one of the calls with Total Telemarketing Communications (TTC), the interview seemed to sour during the middle of the interview. After the conference call was over, Mark Pavlansky called TTC and asked what was wrong. TTC explained to Mark Pavlansky that Scott may not have recalled them but that they recalled Scott. TTC went on to explain that in January 2005, they had been interviewing for an

identical project with Scott and Con-Fortaire, Inc. of Tupelo, Mississippi. TTC explained that the deal between Scott and Con-Fortaire, Inc. went bad at the last moment and the project fell through.

13. Mark Pavlansky called and spoke with James Alsip of Con-Fortaire, Inc. Alsip explained that he was involved in an identical scenario with Scott and WCP except that Scott was going to the effort of locating the call centers himself. Alsip explained to Mark Pavlansky that prior to entering into a contract, Alsip began to have a few issues with Scott and he asked Scott for proof of the funds to be used in marketing the joint venture. Scott told Alsip that his investors wished to keep all of their financial affairs confidential and refused to provide proof of the funds. As a result, the transaction fell through.

14. Mark Pavlansky explained that he did not have a direct dial telephone number for Scott and he had never met Scott in person. In order to reach Scott, Mark Pavlansky called a telephone number provided in New York and left a voice-mail message for Scott. Within a few minutes, Scott would return Mark Pavlansky's call. On occasions when Scott called Mark Pavlansky on Mark Pavlansky's cellular telephone, the caller identification indicated that the caller was using a blocked number. Hibco does not have caller identification. Furthermore, on the occasions in which Mark Pavlansky and Scott had conference calls with the call centers, Scott demanded to arrange the conference calls himself rather than allow Mark Pavlansky to arrange the calls, even though Mark Pavlansky had offered to make the arrangements. Mark Pavlansky has also offered to meet Scott on several occasions and Scott has provided various excuses as to why he was unable to meet.

15. Scott utilizes an address of 1716 Fruitville Road, Sarasota, Florida, as the business address of WCP. Mark Pavlansky has sent Scott several overnight express packages via commercial interstate carrier at this address and Scott has called Mark Pavlansky the next morning and discussed the contents of the overnight express package. Affiant requested that SA Leo Martinez of the Sarasota Resident Agency of the FBI conduct an investigation to determine if WCP was located at this address. SA Martinez conducted a physical surveillance and pretext phone call on June 20, 2005, and identified that this location and address is a business which operates as a telephone answering service.

16. After speaking with Swicegood and being warned that WCP may be a fraud, Mark Pavlansky conducted an investigation on the Internet. Mark Pavlansky learned that both United Capital and Winfield Capital are large well known national organizations. As stated above, the person using the name of Scott does business as Winfield Capital Partners and the person using the name of Baldwin did business as United Capital Partners. Mark Pavlansky identified that both United Capital and Winfield Capital have physical addresses which are different from the address for WCP provided by Scott. Mark Pavlansky believed that Scott/Baldwin was attempting to add legitimacy to his companies by making them appear to be affiliated with the large national organizations. Mark Pavlansky searched the Secretary of State's websites in New York, Florida and Illinois, the three states in which Scott purported to do business, and he was unable to locate any records for WCP or UCP.

17. Through contact with Vita-Foam, Mark Pavlansky obtained a copy of the contract between Vita-Foam and UCP and Mark Pavlansky compared it to the contract provided by Scott. Pavlansky advised that the contracts have an identical font and that the format, terms and setup of the contracts are nearly identical. Affiant obtained and reviewed copies of the contracts. A review of the contracts confirmed Mark Pavlansky's and Swicegood's accounts of the transactions.

18. Mark Pavlansky forwarded to Affiant sixty-five e-mails Mark Pavlansky received from the person using the name of Scott. The e-mails are dated between April 9 and June 17, 2005. The e-mails were sent from the e-mail address of Martin-S@Winfield-Capital.com. During previous conversations, Scott has reported that WCP's Chief Financial Officer is Carl Sinclair who can be contacted at the e-mail address of Carl-Sinclair@Winfield-Capital.com. A review of the e-mails confirmed the basic information provided Affiant by Mark Pavlansky.

19. Affiant chose ten of the e-mails referenced above and reviewed the details section of those e-mails. The e-mails were sent between April 9 and June 17, 2005. The details section provides the Internet Protocol address (IP address) used to send the e-mails. Furthermore, the details section provides the time in which the e-mail was sent. An IP address is a unique number, such as a telephone number, assigned to an Internet service provider. An IP address is assigned when a user accesses the Internet. Only one user of an IP address can access the Internet at the same time.

20. Your affiant searched the Internet website, www.arin.net, which identifies the Internet service provider to which each IP address is assigned and identified Level Three Communications as the holder of the IP address used in the reviewed e-mails. Thereafter, your affiant subpoenaed Level Three Communications in order to determine the user of the IP addresses at the corresponding times identified in the reviewed e-mails. Records provided by Level Three Communications revealed that the e-mail account, M-Scott@earthlink.net, was the user of the IP addresses at the times identified. Furthermore, Level Three Communications identified, through caller ID, that they were accessed by telephone number (941) 907-3001 on nine occasions and (941) 907-3000 on one occasion.

21. A search of the Internet Website, www.whitepages.com, identified the subscriber of telephone number (941) 907-3000 as Aspire Technologies Group of Sarasota, Florida. No address was provided. No records were located in reference to telephone number (941) 907-3001. Subpoenas have been issued to Verizon Wireless of Florida to obtain the subscriber information of both telephone numbers, however, records have not been received to date.

22. Affiant interviewed Attorney Jim Bingham who represents Vita-Foam. Bingham confirmed that in the Fall of 2002, Vita-Foam had entered into an agreement with Baldwin doing business as UCP and that the relationship lasted until Baldwin disappeared in early 2003. Shortly thereafter, Vita-Foam was sued by several publishers. Bingham estimated that the total publishing bills left unpaid by Baldwin exceeded $1,000,000. The advertising was purchased by Harold Communications of Pennsylvania. Harold Communications disappeared at approximately the same time as Baldwin. Bingham advised that Baldwin was using a mail drop box in Tampa, Florida and

that UCP utilized the e-mail addresses of wcarter@united-capital.com for the supposed Chief Financial Officer and jbaldwin@united-capital.com. These e-mail addresses are similar in nature to the e-mail addresses utilized by Scott and WCP. Bingham further advised that Baldwin directed that wire transfers of his investors' shares of profits from the joint venture were to be sent to a UBS Financial Services securities account in the name of "The Enterprise Group." No one at Vita-Foam ever met Baldwin in person.

23. Affiant interviewed Swicegood and another former Vita-Foam employee, Daryl Booi. Affiant played for them two voice mail recordings left for Mark Pavlansky by Scott. Both immediately identified the voice as being that of the man they knew by the name of Baldwin. They also estimated that Baldwin received approximately $400,000 from the scheme, including a $100,000 buy-out from Vita-Foam. During the interviews, each confirmed the basic information provided Affiant by Mark Pavlansky. Swicegood also advised that he learned that Scott had previously approached his current employer, a foam company, and another foam company in New Jersey and pitched the same offer as he proposed to Hibco.

24. Prior to contacting the FBI, the last remaining action for Hibco and Scott to begin marketing and manufacturing the foam bed toppers was for Hibco and Scott to agree on a telemarketing firm. Hibco believed that once a telemarketing firm was chosen, Scott was going to immediately place advertisements in magazines. Hibco and Scott had previously discussed marketing and manufacturing foam mattresses and in order to "buy more time" and prevent Scott from placing advertisements, Hibco and Scott further discussed marketing and manufacturing the foam mattresses. On June 21, 2005, Mark Pavlansky had a one hour long telephone conversation with Scott. On June 22, 2005, at the direction of your Affiant, Mark Pavlansky sent Scott a United Parcel Service (UPS) package which contained a computer disk containing pictures of foam mattresses. The UPS package was sent to Scott at the address previously utilized by Scott and WCP of 1716 Fruitville Road, Sarasota, Florida. As explained in ¶ 16, this address is an answering service. Prior to receiving packages in the past, Scott had always requested the tracking number of the package. Keith Pavlansky and Scott discussed that the package was being sent to arrive on the morning of June 23, 2005, and Mark Pavlansky sent Scott an e-mail notifying him that the package had been sent and providing the tracking number. Scott responded and acknowledged Mark Pavlansky's e-mail.

25. On the morning of June 23, 2005, SA Martinez made contact with the answering service located at 1716 Fruitville Avenue. The employees of the answering service were familiar with and confirmed that they had a customer by the name of Martin Scott, who had been a customer for approximately two to three months. The employees of the answering service described Scott as a nice elderly gentleman and they advised that Scott had brought them cookies. The employees of the answering service advised that they did not have a method to contact Scott and that he always initiated contact with the answering service. They also were unfamiliar with the type of car which Scott drove, because on the occasions in which Scott came to the answering service to pick up packages, Scott always walked across a grassy area into their parking lot and then approached the

answering service door. SA Martinez observed that the answering service had a parking lot with ample parking which could have been used by Scott.

26. Based upon UPS tracking records, the package sent by Hibco arrived at the answering service at 9:51 AM. SA Martinez advised your Affiant that at approximately 11:00 AM, an elderly white male approached the answering service on foot and entered the answering service. After a short period of time, the elderly white male exited the answering service carrying a UPS package and walked a distance of approximately two blocks at which point he got into a 2003 Lincoln registered to Lawrence Solin of Post Office Box 5577, Sarasota, Florida. Shortly thereafter, an employee of the answering service called SA Martinez on his cellular telephone and advised that the person they knew as Scott had just picked up the package. Solin's drivers license information lists his date of birth as September 14, 1928 and it lists his physical description as a white male, 5'7" tall. This description fits that of the elderly male who SA Martinez observed picking up the UPS package. Furthermore, SA Martinez reviewed a driver's license photograph of Solin and SA Martinez believed that Solin and the elderly white male are one and the same.

27. SA Martinez and another law enforcement officer conducted a continuous surveillance of Solin and his vehicle until Solin arrived at an office suite in an industrial park known as "Lakewood Ranch." SA Martinez observed Solin use keys to unlock and enter a business suite located at 7345 International Place, Suite 104, Sarasota, Florida. SA Martinez did not observe any other persons at the business suite. There was no name listed directly on the outside of the suite but a column located near the entrance to the complex listing the tenants of the building including a listing for "Aspire Technologies." SA Martinez observed Solin carry the UPS package into the business suite.

28. Florida Corporation and Limited Partnership records identified that Lawrence Solin is the registered agent and an officer and director of Aspire Technologies Group, Inc. of 7345 International Place, Suite 104, Sarasota, Florida 34240.

29. At approximately 12:10 PM, while SA Martinez was still conducting a surveillance of the business suite to which he observed Solin enter and remain, Mark Pavlansky received a telephone call from the person he knows as Scott. The phone call lasted for over one hour. Mark Pavlansky advised that during the phone conversation that he and the person he knows as Scott discussed the contents of the computer disk sent in the UPS package. Based upon the conversation, it was apparent to Mark Pavlansky that the person he knows as Scott had inserted the disk into a computer and was reviewing the pictures with Mark Pavlansky during the conversation. SA Martinez drove by Suite 104 later in the afternoon and Solin's car was still at the location.

### Conclusion

30. Based upon the foregoing, Affiant submits there is probable cause to believe that Lawrence Solin, while using an using the aliases of Martin Scott, doing business as Winfield Capital Group, and James Baldwin, doing business as United Capital Partners, devised, executed, and has

attempted to execute a scheme to defraud involving material false statements and the fraudulent concealment of material information. Solin executed this scheme and artifice to defraud using commercial interstate carriers and interstate wire communications, in violation of 18 U.S.C. §§ 1341 and 1343, mail and wire fraud.

*David T. Gardner*
David T. Gardner
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 28th day of June, 2005.

*Russell A. Eliason*
Russell A. Eliason
U.S. Magistrate Judge